# Supreme Court of Florida

_____

No. SC18-557
_____

**JAMES MILTON DAILEY,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

October 3, 2019

PER CURIAM.

James Milton Dailey, a prisoner under sentence of death, appeals the circuit court's order denying his second successive motion for postconviction relief, which was filed under Florida Rule of Criminal Procedure 3.851. We have jurisdiction. *See* art. V, § 3(b)(1), Fla. Const. For the reasons that follow, we affirm.

## I. BACKGROUND

Dailey was convicted of and sentenced to death for the murder of Shelley Boggio. We have described the facts of the crime as follows:

> Shelley Boggio's nude body was found floating in the water
> near Indian Rocks Beach in Pinellas County, Florida. She had been

stabbed repeatedly, strangled, and drowned.  On the day of the murder, Shelley, her twin sister Stacey, and Stephanie Forsythe had been hitchhiking along a road near St. Petersburg, Florida.  They were picked up by Dailey, Jack Pearcy, and Dwayne "Oza" Shaw.  The three men drove the girls to a local bar.  Stacey and Stephanie returned home shortly thereafter, but Shelley remained with the group and returned to Jack Pearcy's house.  Dailey was living in Pearcy's home, where he had his own bedroom.  Pearcy and his girlfriend, Gayle Bailey, shared a second bedroom.  Shaw, a friend of Pearcy's from Kansas, was temporarily staying at Pearcy's house while he resolved marital issues.  He slept on a couch in the living room.

Shaw testified that on the night of the murder he drove with Pearcy and Boggio to a public telephone booth, where he was dropped off.  Pearcy and Boggio then drove off alone.  After speaking on the phone for several minutes, Shaw returned to the house on foot and fell asleep on the couch.  Shaw testified that when he woke up later that night, he saw Pearcy and Dailey, but not Boggio, entering the house together.  Shaw noticed that Dailey's pants were wet.

The State presented testimony from the lead detective in the case, John Halladay, and three informants who were inmates at the same facility where Dailey was held while awaiting trial.  One of the inmates, Paul Skalnik, testified that Dailey had struck a deal with Pearcy, who had also been charged with Boggio's murder.  Skalnik testified that he relayed messages between Dailey and Pearcy.  According to Skalnik, Dailey promised that if Pearcy did not testify at Dailey's trial, Dailey would attempt to exonerate Pearcy once he was acquitted.

Based on the testimony of Shaw, Skalnik, and several other witnesses, Dailey was found guilty of first-degree murder and was sentenced to death.

*Dailey v. State*, 965 So. 2d 38, 41-42 (Fla. 2007) (footnote omitted).  On direct appeal, we upheld the conviction but reversed the sentence.  *Dailey v. State*, 594 So. 2d 254, 259 (Fla. 1991).  The trial court again sentenced Dailey to death on remand.  *Dailey v. State*, 659 So. 2d 246, 247 (Fla. 1995).  We affirmed, *id.* at 248, and the Supreme Court denied Dailey's petition for a writ of certiorari, *Dailey v.*

*Florida*, 516 U.S. 1095 (1996).  Thereafter, we affirmed the denial of Dailey's initial postconviction motion and denied his petition for a writ of habeas corpus. *Dailey*, 965 So. 2d at 41.  We also affirmed the denial of his first successive postconviction motion.  *Dailey v. State*, 247 So. 3d 390, 391 (Fla. 2018).

On June 21, 2017, Dailey filed a second successive postconviction motion, raising three claims.  He asserted that: (1) newly discovered evidence requires that his conviction be overturned; (2) the State committed *Brady*[1] and *Giglio*[2] violations; and (3) his death sentence is unconstitutional because he is innocent. Following a case management conference, the circuit court granted an evidentiary hearing on two newly discovered evidence claims.  Dailey subsequently requested that the court take judicial notice of certain documents; his request was denied.

After the evidentiary hearing, the circuit court issued a final order rejecting all claims.  Dailey now appeals the circuit court's order and its denial of his request for judicial notice.

---

1.  *Brady v. Maryland*, 373 U.S. 83 (1963).

2.  *Giglio v. United States*, 405 U.S. 150 (1972).

## II.  ANALYSIS

### A.  Newly Discovered Evidence

In his first claim, Dailey argues that newly discovered evidence exists in the form of: (1) an affidavit from Jack Pearcy, his codefendant; (2) testimony from Mike Sorrentino, James Wright, and Travis Smith, former inmates who were housed at the same jail as Dailey; (3) documents indicating that Paul Skalnik, an inmate who testified on behalf of the State at trial, is not a credible witness; and (4) an Indian Rocks Beach Police report.

In order to set aside a conviction based on newly discovered evidence, two requirements must be satisfied.  First, the evidence "must have been unknown by the trial court, by the party, or by counsel at the time of trial, and it must appear that defendant or his counsel could not have known [of it] by the use of diligence." *Jones v. State*, 709 So. 2d 512, 521 (Fla. 1998) (alteration in original) (quoting *Torres-Arboleda v. Dugger*, 636 So. 2d 1321, 1324-25 (Fla. 1994)).  Second, the "evidence must be of such nature that it would probably produce an acquittal on retrial." *Id.*  However, regardless of whether the "evidence meets the threshold requirement by qualifying as newly discovered, no relief is warranted" unless the evidence would be admissible at trial.  *Sims v. State*, 754 So. 2d 657, 660 (Fla. 2000).

## 1. Jack Pearcy's affidavit

Dailey first appeals the circuit court's denial of his claim that a newly discovered affidavit from Jack Pearcy proves that Pearcy, who also was convicted of murdering Boggio, is solely responsible for the murder. When the lower court has ruled on a newly discovered evidence claim following an evidentiary hearing, we review its "findings on questions of fact, the credibility of witnesses, and the weight of the evidence for competent, substantial evidence." *Green v. State*, 975 So. 2d 1090, 1100 (Fla. 2008). The lower court's application of the law to the facts, however, is reviewed de novo. *Id.*

In the affidavit, Pearcy states: "James Dailey was not present when Shelly Boggio was killed. I alone am responsible for Shelly Boggio's death." But Pearcy refused to testify about any substantive assertion in the affidavit at the evidentiary hearing. After admitting that he signed the affidavit, he testified that its contents were not true. When asked to identify the untruthful statements, he responded, "I'm not sure. There's quite a few lines on there." Pearcy eventually stated that paragraphs one and two—which listed his name and status as an inmate, and recognized that he had been convicted of Boggio's murder and sentenced to life imprisonment—were true. When questioned about the truthfulness of each remaining paragraph, Pearcy invoked the Fifth Amendment. He continued to do so after the court compelled him to answer.

Following the hearing, the circuit court held that the affidavit was inadmissible hearsay. Dailey alleges that the court erred in so ruling because the affidavit is admissible as a statement against interest and a third-party admission of guilt under *Chambers v. Mississippi*, 410 U.S. 284 (1973). Because neither exception to the hearsay rule applies, we affirm the lower court's ruling.

Dailey first argues that the affidavit is admissible as a declaration against interest under section 90.804(2)(c), Florida Statutes (2017). But the circuit court was justified in concluding that under the circumstances here, Pearcy's assertion that he alone killed Boggio was not a statement which "a person in the declarant's position would not have made . . . unless he or she believed it to be true." § 90.804(2)(c), Fla. Stat. (2017). Pearcy had already been convicted of the crime to which he confessed. He did not expose himself to any additional criminal liability for Boggio's murder by accepting sole responsibility for her death. *See Marek v. State*, 14 So. 3d 985, 995 (Fla. 2009). Further, given that Pearcy claimed the affidavit was false and refused to testify about any of its substantive assertions, we agree with the circuit court's determination "that Pearcy's affidavit is hearsay of an exceptionally unreliable nature and does not qualify as a statement against interest."

Nor does the affidavit qualify as a third-party admission of guilt under *Chambers*. In *Bearden v. State*, 161 So. 3d 1257, 1265 (Fla. 2015), we identified

four factors relevant to determining whether a third party's hearsay confession may be admitted as substantive evidence:

> (1) the confession or statement was made spontaneously to a close acquaintance shortly after the crime occurred; (2) the confession or statement is corroborated by some other evidence in the case; (3) the confession or statement was self-incriminatory and unquestionably against interest; and (4) if there is any question about the truthfulness of the out-of[-]court confession or statement, the declarant must be available for cross-examination.

Dailey contends that the second factor has been met because the statements in Pearcy's affidavit are corroborated by Juan Banda—who testified that Pearcy said Dailey was innocent of the crime for which he had been sentenced to death—and Travis Smith—who testified that Pearcy claimed the murder charge "was his charge and his charge alone." But regardless of any corroborating evidence, we conclude that all other factors weigh heavily in favor of excluding the affidavit. The first factor is not satisfied; the affidavit was executed more than thirty years after the murder, not shortly after the crime occurred. The affidavit similarly fails to meet the third factor. Pearcy's statement in the affidavit that he alone killed Boggio is not unquestionably against his interest. Pearcy had already been tried, convicted, and sentenced for Boggio's murder at the time the affidavit was executed. Finally, questions about the truthfulness of the affidavit arose when Pearcy testified that its contents were false. But Pearcy's persistent invocation of

the Fifth Amendment caused him to be unavailable for cross-examination.  We therefore affirm the circuit court's denial of relief.

**2.  Testimony from Mike Sorrentino, James Wright, and Travis Smith**

Dailey next argues that the circuit court erred in rejecting his claim that newly discovered evidence exists in the form of testimony from Mike Sorrentino, James Wright, and Travis Smith.  All three are former inmates who were once incarcerated with Dailey.  At the evidentiary hearing, each testified that detectives came to the county jail, called him into an interview room where newspaper articles about Boggio's murder were in plain view, and asked him if he had any information about the crime.  Dailey contends that this testimony proves that detectives were attempting to suggest facts to potential witnesses.

Smith additionally stated that he knew Pablo DeJesus and James Leitner, two inmates who testified against Dailey at trial.  Smith said that he never saw Dailey discuss his case with either of them.  Smith claimed to have heard DeJesus and Leitner planning to tell prosecutors false information about Dailey in order to receive reduced sentences.  Dailey contends that this testimony would have cast doubt on DeJesus's and Leitner's credibility.

The circuit court held that the instant claim was "untimely or otherwise procedurally barred."  We agree.  In his 1999 motion for postconviction relief, Dailey alleged that his trial counsel was ineffective for failing to utilize the

testimony of Wright, Sorrentino, and Smith.  He claimed that Wright and Sorrentino could have testified that they were approached by detectives prior to his trial and were shown newspaper articles regarding the murder.  Dailey further explained that Smith could have provided testimony that he overheard DeJesus and Leitner discussing their plan to falsely testify against Dailey.  In 2004, Dailey chose to waive the claim "for strategic purposes," and the claim was later dismissed by the trial court.

This history demonstrates that the information Dailey now contends is newly discovered was known to him in 1999.  "To be considered timely filed as newly discovered evidence," a successive rule 3.851 motion must be "filed within one year of the date upon which the claim became discoverable." *Jimenez v. State*, 997 So. 2d 1056, 1064 (Fla. 2008).  Because the motion was filed eighteen years after the claim was discovered, the claim is clearly procedurally barred.

In response, Dailey argues that his prior postconviction counsel was ineffective for waiving the earlier claim.  He contends he is entitled to relief under *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Trevino v. Thaler*, 569 U.S. 413 (2013).  But his reliance on those decisions is misplaced.  We have previously recognized that *Martinez* and *Trevino* only apply "to federal habeas proceedings" and therefore "do[] not provide an independent basis for relief in state court." *Banks v. State*, 150 So. 3d 797, 800 (Fla. 2014) (quoting *Howell v. State*, 109 So. 3d 763,

774 (Fla. 2013)). "Moreover, we have 'repeatedly held that claims of ineffective assistance of postconviction counsel are not cognizable.' " *Id.* (quoting *Howell*, 109 So. 3d at 774). Accordingly, we affirm the circuit court's denial of relief.

### 3. Evidence discrediting Paul Skalnik's testimony

Dailey next argues that the circuit court erred in summarily dismissing his claim that newly discovered evidence discredits the testimony of Paul Skalnik, an inmate who testified against Dailey at trial. We review a circuit court's summary rejection of a postconviction claim de novo, "accepting the movant's factual allegations as true to the extent they are not refuted by the record, and affirming the ruling if the record conclusively shows that the movant is entitled to no relief." *Pardo v. State*, 108 So. 3d 558, 561 (Fla. 2012) (quoting *Gore v. State*, 91 So. 3d 769, 774 (Fla. 2012)).

In support of his claim, Dailey relies on documents allegedly demonstrating that: Skalnik had made false allegations against correctional officers; Skalnik had been described by a probation officer as manipulative; Skalnik's trial testimony about his criminal history was incomplete; and that the State was considering offering him a reduced sentenced in exchange for testifying against Dailey, even though Skalnik claimed at trial that he had not made a deal with the State. Finally, Dailey claimed that Skalnik's former attorney would testify that Skalnik had received preferential treatment from the State.

- 10 -

The circuit court found that the claim was untimely. We agree. As recognized by the circuit court, all evidence presented by Dailey "could have been discovered earlier through due diligence." The date on each document supporting this claim reflected that it was created in the 1980s. And information about any arrangement Skalnik had with the State "would have also been discoverable through due diligence around 1987," when Dailey was tried and sentenced.

Dailey neglects to explain why this information could not have been discovered earlier. Instead, he argues that his postconviction counsel was ineffective for failing to previously discover it and contends that any untimeliness should be excused under *Martinez* and *Trevino*. Because this argument is meritless, we affirm the circuit court's summary dismissal of the instant claim.

### 4. Indian Rocks Beach Police report

Dailey next argues that the circuit court erred in summarily dismissing his claim that a newly discovered Indian Rocks Beach Police (IRBP) report proves he was not with Pearcy when Boggio was killed. The report contains statements made by Oza Shaw, who testified against Dailey at trial, during an interview with IRBP detectives in May of 1985. According to the account in the report, Shaw told the detectives that he, Dailey, Pearcy, and Boggio all went to Pearcy's house on the night of the murder. Pearcy and Boggio then gave Shaw a ride to a nearby telephone booth. After making a phone call, Shaw walked back to the house. He

- 11 -

later observed Pearcy return home to pick up Dailey, but did not see Boggio with Pearcy. Pearcy and Dailey then left the house together, and Shaw fell asleep. He was awakened when the two returned later that night. As they entered the house, Shaw noticed that Dailey's pants were wet.

The version of events described in the IRBP police report differed from Shaw's original trial testimony, in which Shaw did not mention seeing Pearcy return home alone to pick up Dailey. Rather, in the trial testimony, Shaw only recalled seeing Pearcy and Dailey return home together at the end of the night. Dailey appears to argue that Shaw's statements in the IRBP report suggest that Pearcy killed Boggio alone.

The circuit court denied the claim as untimely, concluding that the IRBP report had been "raised in the context of a *Brady* claim, which [Dailey] abandoned at the evidentiary hearing on [his] initial postconviction motion." Dailey asserts that, contrary to the lower court's holding, the *Brady* claim in his earlier postconviction motion is distinguishable from the claim at hand because they relate to different documents associated with different law enforcement officers.

Regardless of whether the *Brady* claims are distinct, we conclude that the circuit court properly denied relief. First, the claim is untimely because Dailey has failed to explain why information in a report from 1985 could not have been previously discovered by use of reasonable diligence. He only argues that prior

postconviction counsel was ineffective for failing to discover it and asserts entitlement to relief under *Martinez* and *Trevino*. This argument is unavailing.

We note that in any event, the statements in the IRBP report fail to satisfy the second prong of *Jones*. In the version of events described in the IRBP report, Shaw still recalled seeing Pearcy and Dailey return to the house together without Boggio late that night. He also remembered that Dailey's pants were wet; Boggio was found in the water. *Dailey*, 965 So. 2d at 41. Therefore, the statements in the IRBP report would not probably produce an acquittal upon retrial. The instant claim is accordingly meritless.

### 5. **Cumulative analysis**

Dailey next argues that the circuit court erred in failing to conduct a cumulative analysis. Generally, in determining whether newly discovered evidence would likely produce an acquittal upon retrial, a court must evaluate "the effect of the newly discovered evidence, in addition to all of the admissible evidence that could be introduced at a new trial." *Hildwin v. State*, 141 So. 3d 1178, 1184 (Fla. 2014). But given that all of Dailey's newly discovered evidence claims were either correctly rejected as untimely or based on inadmissible evidence, no such analysis was necessary. Thus, Dailey is not entitled to relief on this claim.

## B. *Giglio* Violations

Dailey next argues that the lower court erred in summarily dismissing his claim that the State committed two *Giglio* violations.[3]  First, Dailey contends that the State failed to correct Paul Skalnik's false trial testimony about his criminal history.  At trial, Skalnik testified that the charges against him were "grand theft . . . not murder, not rape, no physical violence in my life."  Dailey asserts that this testimony is a significant understatement of Skalnik's criminal history because it omits that Skalnik had previously been charged with lewd and lascivious conduct on a child under fourteen years of age.

The second alleged *Giglio* violation stems from the State's impeachment of Oza Shaw at the evidentiary hearing on Dailey's initial postconviction motion.  There, Shaw testified that on the night of the murder, he saw Pearcy come home alone, without Boggio, and walk into Dailey's bedroom.  He claimed that the pair then left the house and returned together later that night.  On cross-examination, the State impeached Shaw with his trial testimony, which made no mention of Pearcy returning home without Boggio to pick up Dailey.  Dailey contends that the State's line of questioning was improper because it suggested that Shaw's

---

3. Though *Brady* is listed in the heading of the claim and is cited once in the body of the brief, Dailey does not raise any arguments under *Brady*.

testimony at the hearing was a recent fabrication, even though Shaw provided an identical version of events in the May 1985 interview with IRBP detectives.

The circuit court rejected both *Giglio* claims. We affirm because each claim fails on the merits. To establish a *Giglio* violation, Dailey must show that: "(1) the testimony given was false; (2) the prosecutor knew the testimony was false; and (3) the statement was material." *Moore v. State*, 132 So. 3d 718, 724 (Fla. 2013). The statement is "material 'if there is any reasonable possibility that it could have affected the' " judgment of the factfinder. *Id.* (quoting *Tompkins v. State*, 994 So. 2d 1072, 1091 (Fla. 2008)).

Even assuming he could establish the first two prongs of *Giglio*, Dailey's first claim fails because Skalnik's testimony about his criminal history was not material. Dailey suggests that the jury would be less likely to believe Skalnik's testimony about Dailey if it knew of the lewd and lascivious conduct charge. But Skalnik's credibility was already compromised because the jury was aware that he had committed multiple crimes. And Skalnik was not the only witness against Dailey; two other inmates also testified that Dailey confessed to the murder. *Dailey*, 594 So. 2d at 256. Accordingly, there is no reasonable possibility that information regarding Skalnik's lewd and lascivious assault charge would have affected the jury's verdict.

Initially, we note that while Dailey's next claim is based on postconviction testimony, Dailey has not cited to any case holding that *Giglio* applies to postconviction proceedings. *Cf. Dist. Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 68-69 (2009) (rejecting *Brady*'s applicability at the postconviction stage). In any event, this claim fails under the first prong of *Giglio*. Though Dailey suggests that the State's questioning of Shaw was somehow misleading, he has not asserted that any part of Shaw's testimony at the evidentiary hearing was false. Accordingly, the claim is meritless.

## C. Judicial Notice

Dailey next argues that the lower court erred in declining to take judicial notice under section 90.202, Florida Statutes (2017), of certain records, including court files of Pearcy, court files of the three inmates who testified against Dailey at trial, and deposition testimony from the prosecutor who tried Dailey's case. In the 2003 deposition, the prosecutor testified that she would not use Skalnik as a witness again, because she feared he would testify dishonestly.

Judicial notice is reviewed for an abuse of discretion. *See Morton v. State*, 995 So. 2d 233, 244 (Fla. 2008). We conclude that the circuit court did not abuse its discretion in declining Dailey's request because the documents were not relevant to either of the claims that were granted an evidentiary hearing. Dailey is therefore not entitled to relief on this claim.

### D. Actual Innocence

Dailey last contends that the circuit court erred in summarily rejecting his claim that he is actually innocent. His argument lacks merit because freestanding claims of actual innocence are not cognizable under Florida law. *Tompkins*, 994 So. 2d at 1089. Accordingly, we affirm the circuit court's denial of relief.

### III. CONCLUSION

For the reasons above, we affirm the circuit court's order denying in part and dismissing in part Dailey's successive motion for postconviction relief.

It is so ordered.

CANADY, C.J., and POLSTON, LABARGA, LAWSON, LAGOA, LUCK, and MUÑIZ, JJ., concur.

ANY MOTION FOR REHEARING OR CLARIFICATION MUST BE FILED BY 4:00 P.M. ON TUESDAY, OCTOBER 8, 2019. A RESPONSE TO THE MOTION FOR REHEARING/CLARIFICATION MAY BE FILED BY 4:00 P.M. ON FRIDAY, OCTOBER 11, 2019. NOT FINAL UNTIL THIS TIME PERIOD EXPIRES TO FILE A REHEARING/CLARIFICATION MOTION AND, IF FILED, DETERMINED.

An Appeal from the Circuit Court in and for Pinellas County,
    Frank Quesada, Judge - Case No. 521985CF007084XXXXNO

Eric Pinkard, Capital Collateral Regional Counsel, and Chelsea Rae Shirley, Julissa R. Fontán, and Kara Ottervanger, Assistant Capital Collateral Regional Counsel, Middle Region, Temple Terrace, Florida; Seth Miller, Innocence Project of Florida, Inc., Tallahassee, Florida; Laura Fernandez, New Haven, Connecticut; and Cyd Oppenheimer, New Haven, Connecticut,

    for Appellant

Ashley Moody, Attorney General, Tallahassee, Florida, and Christina Z. Pacheco, Assistant Attorney General, Tampa, Florida,

    for Appellee

Elliot H. Scherker of Greenberg Traurig, P.A., Miami, Florida, and Karen M. Gottlieb, Florida Center for Capital Representation, Florida International University College of Law, Miami, Florida,

    for Amicus Curiae Right Reverend Neil Lebhar, Bishop of the Gulf Atlantic Diocese of the Anglican Church in North America

Craig Trocino, Director, Miami Law Innocence Clinic, University of Miami School of Law, Coral Gables, Florida, and Michael Ufferman of Michael Ufferman Law Firm, P.A., Tallahassee, Florida,

    for Amicus Curiae the Innocence Network